UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
JEFFREY BARTELS,

                         Plaintiff,

-against-

DENNIS P. GUARIGLIA, individually and in
his official capacity as a police officer of the
Incorporated Village of Lloyd Harbor, and
MAUREEN DILLNER, individually,
                         Defendants.
---------------------------------------------------------X

**MEMORANDUM & ORDER**
16-CV-1848 (DRH)(SIL)

**APPEARANCES:**

**For Plaintiff**
James M. Maloney. Esq.
33 Bayview Avenue
Port Washington, New York, 11050

**For Defendants:**
Morris Duffy Alonso & Faley
Two Rector Street, 22d Floor
New York, New York 10006
By:    Kenneth E. Pitcoff, Esq.
           Michael A. Czolacz, Esq.

**HURLEY, Senior District Judge:**

        Plaintiff Jeffrey Bartels ("Plaintiff" or "Bartels") commenced this action pursuant to 42 U.S.C. § 1983 against defendants Dennis P. Guariglia ("Guariglia") and Maureen Dillner ("Dillner") (collectively "Defendants") asserting claims for "Malicious Prosecution" and "Depravation of Other Federal Right." (Complaint at unnumbered pages 4 & 5.)[1] Presently

---

[1] This latter cause of action refers to alleged deprivations of Second and Fifth Amendment Rights. (Comp. ¶21.)

before the Court is Defendants' motion for summary judgment. For the reason set forth below, the motion is granted.

## BACKGROUND

The following facts are taken from parties' 56.1 Statements and are undisputed unless otherwise noted:

At all times relevant herein, Dillner has been employed by the Village of Lloyd Harbor (the "Village"). On or about April 6, 2013, Plaintiff was driving through Fiddler's Green,[2] a gated community in the Village, when he saw Dillner's husband and son removing fallen tree limbs. He exited the vehicle and attempted to video record these activities; a confrontation ensued. (Pl.'s 56.1 Resp. at ¶¶ 1-2.)

Plaintiff has left numerous messages on the Village Highway Department's voicemail, some of which are reproduced below based upon a transcript of the messages produced by Plaintiff during this litigation.

On April 10, 2013 at 7:39am Plaintiff left the following message:

Yeah John, Jeff Bartels.  One last thing, especially to the Dillners, the mayor and the affluent, arrogant A-holes that live around here in this village and have done just such an incredible job of destroying so many different angels and then spinning.  It's just disgusting.
Uh, in any case this is something to think about – all of ya.  How many people from Lloyd Harbor do their food shopping in Huntington Station at the food pantry, okay, the new place that opened up a couple years ago.  Gee, you know, go rub elbows with the servants and your slaves – the way you treat 'em.  How many people around here get waved to and wave to landscapers, tree crews?  God knows. Rocky or whatever from M&M Tree.  I've been photographing him up in trees for, God, seven years now.  Have I ever released any of that stuff?  No.  Do he and I talk?  Yes.  I mean, he's even a witness in one of the—one of the—the ticket that was given to me by, I guess Officer G, a long time ago by Fort Hill when they were cutting trees.  For what?  For this stuff.
So, you know, you go down to the town of Huntington and ask around how many people know me.  I'm born here folks.  I'm educated here.  I went through the

---

[2] Bartels is apparently a resident of Fiddlers Green (*see* Pl.'s 56.1 Resp at 1) and based on the voicemail messages referenced herein, Dillner was (at least at the time of the messages) also a resident, as well as a member of its Board.

school systems here. I'm a result of all that. Trying to protect the environment for the future generations. What the F have you done? Okay? You just enabled the people to destroy it, whether it's you, Ms. Dillner, or Gail Duval handing out cutting permits to landscapers that don't have proper insurance or if you hand—they—you just—you hand them out like jellybeans like trying to buy favors, mayor. And that's what we're going to prove. You've Swiss cheesed—watch the town hall meeting—you have Swiss cheesed the hillsides of this village. It's just all for (unintelligible) to increase property values. It is disgusting, but you know what you've done now? You've opened yourself up and tell this to all your friends. I can now videotape, I can now photograph, I can even send in a little hovercraft, a little helicopter with a camera on it if I want to. So you've cut down the only thing that gave you privacy and that was trees. You gave up your privacy by cutting down trees--

(*Id.* ¶4.)

On April 12, 2013 at 6:21am Bartels left the following message directed at Dillner and her family:

> Yeah, good morning, John. It's still Jeff Bartels. It's still Friday Morning, April something—what 11th, 12th, something like that, 2013. It's about 6:05 or so in the morning.
> This message is for Ms. Dillner, the mayor, anyone else all involved, Gail Duval, Eileen Schultz, Mike McCabe. You all—your testimony in federal court in my first trial was, needless to say, not accurate at the very least. Ms. Dillner, you and your husband and now, your son, have devastated my quality of life, my life, you threatened my life, my bodily harm, you name it. Mrs. Dillner, I'm coming after you. I'm gonna try to get you prosecuted for perjury. Anybody who testified in my first case, the D.A. may not be interested in perjury and prosecuting perjury against you. The attorney general of New York State may not be interested in prosecuting you for perjury,but let me tell you something. It's not just collusion, corruption going on only in New York City and only in Albany. Why it has not been exposed and prosecuted on Long Island for all these years, I have no idea, but I can promise you this. Ms. Dillner, you and your husband and your son and Gail Duval and all the rest of youse, you are never, ever, ever going to be—just like I said at Huntington town hall the other day, you will never be able to carry out what you people did to me and my family to anybody ever, ever again. The punitive damages are going to be—I hope also criminal damages—criminal charges, excuse me—against you Ms. Dillner, your husband, your son. It's a family affair I guess with you and your--

(*Id.* ¶5.) Four minutes another message was left:

> As for Ms. Dillner and all the rest of the conspirators, I hope you don't ever get a good night's sleep the rest of your life. How you've destroyed and affected my

> quality of life is something that's going to go down in the history books for eternity.
> And just for the record, I am—like in the first federal court case, yeah, I am a man of Gandhi. I have never ever, ever physically hurt anybody, but what people have done to me, what a bunch of hypocrites you all are. Ms Dillner, I can tell you this. Between the boards that you sat on and the—it's—what I will prove to the jury was absolutely retaliatory. Check this out, folks. The damages are going to be triple, triple damages, when collusion and conspiracy is involved. You better believe it, folks. I'm coming after you all legally in the courts for treble damages. Stick that in your pipe mayor and smoke that one. Ha, you're finished mayor and your whole tired administration is going down. And you're going to be prosecuted, exposed at the very, very least so that you and your little gang can't ever destroy another family's lives.
> Good bye mayor. See you –

(*Id.* ¶ 6.) And at 6:30am Bartels left another "taunting" message directed at Dillner and her family:

> Yeah, this message is entirely—Jeff Bartels. It's Friday morning about 6:12 a.m. This message is entirely for Ms. Dillner.
> You know, you're gonna see Ms. Dillner, I'm going to have a lot more compassion for your son than you've and your husband have ever had for my family and the son of my family, who is me. It's very—Ms. Dillner, I can't tell you how upsetting—here it is, almost a week later. All my injuries—I am literally black and blue. I ache everywhere at the hands of being chased by your husband, Mr. Murphy, and your son. I suggest you people do a little research on what happened in Howard Beach years ago where a gang of thugs chased a young man onto the Belt Parkway, and he was killed. That's basically the same thing that your husband, Mr. Murphy, and your son did to me on Broad Path West last Saturday. I'm going to explain that—will show that in court. Thank God I wasn't run over and killed, but you, your husband and all of them are absolutely liable and responsible for any of the injuries that I incurred. Ms. Dillner, your son, I feel sorry for him to have parents like you, and then to be used like a tool by your husband is disgusting. I'm sure the jury will understand and understand that, but I can tell you this. I'm very mixed emotions about the—what your son did which is on video. So, I don't know what I'm going to do. I know that I'm going to press charges to the utmost extent against your husband and Mr. Murphy. When it comes to your son, I don't necessarily want some stupid thing to haunt him for the rest of his life. I know that I've been trying to fill out forms, and I don't know what to write a because of what happened in 2006 that you were involved with, Ms. Dillner, I—.

(*Id.* ¶ 7.) At 7:43am Bartels left the following message directed at Dillner:

> Yeah no this message is mainly for their—Ms. Dillner, main conspirator.

> Hey, not for anything, this is really—it's not going to be like welcome to Howard Beach. It's going to be welcome to Fiddler's Green. What you and your husband and your son have done now to property values in Fiddler's Green alone, I hope that every single person that's trying to sell their homes comes after you with a lawsuit Ms. Dillner and against your husband. The connections between the Village and the Association have got to stop. Mayor Leland Hairr, not for anything, all this stuff happened underneath your administration and your hands. Well let's see how in federal court this time you say that "oh I had nothing to do with it, I was so busy with my, you know, with my big company, EB or EAB," whatever the hell it is. And then, oh yeah, you try and link me to the—it's--let's see Stepanian. You try and link me to a terrorist like the Stepanian, a convicted terrorist? You son of a bitch. I've never done anything. You know, what prompted this? You know, retaliation and politics.
> So, mayor you can bet your sweet there bottom dollar that this is going to go down in history unlike any story. And I'll make you a bet they make a movie out of it because compared to some of the other crap that's out there that's on T.V., at least the truth would be very entertaining, especially to like the people of the Town of Huntington they all love me. They—they---they—it's amazing because they see how the entitled treat people—the entitled just how evil they are and self-centered like yourself.
> So, mayor you destroyed this village. And God knows the reputation is already bad enough. And now you had to go, you know, Ms. Dillner and her husband had to go do this and her son.
> So, I hope the legislation will be passed that never again can a resident be an employee and be able to work in a conspiracy against residents who questioned the system by just simply pointing out—

(*Id*. ¶ 8.) At 8:26am he left the following message, the fifth of the day:

> Hey, Jeff Bartels. Yeah, one other thing, I'm sitting here limping around. You know, every time I now move, Ms. Dillner, I'm just—I'm in pain. I can't do anything. Guess what? It's emanating out of my groin for God's sakes. Yeah, you know what that means.
> In any case, hey you know what? I used to watch a T.V. show called the Munsters with, you know, that whole crew of characters. Well, you guys are going to be known as The Monsters. Yeah, between you, your husband and it's a family affair and now it's your son as well.
> Not for anything, mayor I think we all should go back into court for my first federal lawsuit. And I'm certainly going to be sending this evidence to Judge Tomlinson. It's going to show clearly how her son who initiated the phone call to the police was already fabricating charges that they could file against me and if all three of them lied. And I'll tell you what, Ms. Dillner, you're finished. You and your family of monsters are finished. And not for anything, I'm going to make sure through prosecution and so forth, that you—and you are made and example of so that this never, never, ever, happens to somebody who's less strong than my family and I. And you can quote that. My family and I are coming after you

monsters with every frigging penny I have to my name. Okay? It's not going to involve my father's. It's going to involve mine. You're finished and your son and all you. When the judges see this, we're going to reopen the first cases. And you are going to be prosecuted to the fullest, promise me. I don't know who your connections—I don't care if Mr. Spoda is your uncle.

(*Id.* ¶ 9.)

On April 18, 2013, at 4:03am, Bartels left the following message addressed to Dillner in which, among other things, he called her and her husband "a bunch of sick, demented, motherfuckers:"

> Yeah hi it's Jeff Bartels. Message is directly for Ms. Dillner. Hey, not for anything the other day, you doing anything about that dead tree on Fiddler's Green property that threatens everybody's lives? It's a double oak tree with no bark on it, Ms. Dillner. Why don't you get that taken down? Okay? Why doesn't your husband and Pete Murphy take care of something like that? Was it just because I pointed it out? In absolute defiance and arrogance, I could—it doesn't matter what I point out. That's wrong with you people. You're such a bunch of sick, demented, motherfuckers it is unbelievable. So, you know—and don't tell me words like that are so offensive to you. You people—people like you are what create words like that and so many others.
> So, listen Ms. Dillner, as we go forward and so forth, because you, your husband and Mr. Murphy are all Fiddler's Green board members, I am coming after every single one of you as board members and also Drew Edgar. So welcome to my world and I am going to pursue you legally, legally, legally for the rest of your life. Okay? Think about that. So you can work all the overtime you want, but I'll be—believe me, it'll be going to pay the settlement. You destroyed my life. The – Ms. Dillner I can't wait to get you back into court again. Okay? When the jury sees you, and your husband, and all your connections, you're finished. And as I said we're going after you for RICO.

(*Id.* ¶ 10.) He then left the following message at 7:45 am:

> Yeah, Jeff Bartels. Message—Thursday morning. Message is for the mayor, and the Dillners, and so forth and so on – whoever it applies to, put it that way.
> I told you we're going to be—I've already got my lawyer. In a couple of weeks, I am meeting with a lawyer and—who specializes in this sort of thing. And believe me from what I've already heard, and what he has heard, and he's going to take you people down legally. And well it looks like maybe another lawyer's going to get involved now. So, let me tell you something. They're not going to—you're not going to bleed me out of—dry out of money like you did with the first lawsuit with thousand-page motions, mayor. You go ahead. You file all the motions you want. We're going to take out all your motions. It's just going to be like this –

> let's go to the video, let's go to the video, let's go to the video. This is going to be one of the first court cases where there's going to be—you think Jody Arias how many days have they been in court for that sick little plot to—you know, slice the guy's head right off and then doesn't remember it almost? You know, it's like made him—just like what happened with that—the other—the football guy who made a PEZ dispenser out of that poor kid who went over. Anyhow, you know what I'm talking about.
> Any case, that's it, you guys. I'm going to spend—my family is going to come after you people. You have destroyed our family. The last years of my father's lives—life was—is—is—is dealing with this horror of what you people have done to his son.
> So, see ya—see ya. And I wish nothing but the worst for you. As it says on the back of my truck – enjoy your karma, folks. You get a lot of evil karma coming your way, man. Unbelievable. And you're going to deserve every bit that God of karma sends you.
> By. You're finished, finished, finished, finished.

(*Id.* ¶ 11.)

Dillner contacted the Village Police Department to make a complaint about Bartels. Guariglia was on duty and took Dillner's complaint. Dillner told Guariglia that she was upset and disturbed by Plaintiff's numerous voicemail messages. Guariglia took a criminal complaint from Dillner and prepared a police report. (*Id.* ¶¶12-15.)

The Village police then forwarded the complaint and the voicemail recordings to the Suffolk County District Attorney's office for a determination as to whether the voicemail messages were a prosecutable offense. The District Attorney's office decided to prosecute Plaintiff for violating N.Y. Penal Law § 240.30(1), and notified the Village police department of that decision. Thereupon Guariglia and Sergeant Migliore issued a criminal citation to Plaintiff notifying him of the charges against him and the dates he was required to appear in court. (*Id.* ¶¶ 17-18.)

Bartels was arraigned on May 7, 2013 before the Honorable Jennifer A. Henry. At the arraignment, the prosecution moved for and was granted a temporary order of protection

pursuant to CPLR 530.13 in favor of Dillner. It is Plaintiff's contention that Dillner "actively campaigned to have such an order of protection." Pursuant to that order and over his attorney's objection, Bartels was directed to surrender his firearms to a deputy sheriff or local police precinct. (*Id*. ¶¶ 19-21.)

Thereafter, Bartels moved for an order dismissing the charges against him pursuant to N.Y. CPL §§ 170.30 and 170.35 on the grounds that Penal Law § 240.30(1) was unconstitutional because the speech at issue was entitled to protection under the First Amendment. The prosecution filed papers in opposition to the motion. In an order dated November 1, 2013, the motion was denied by Judge Henry. Among other things, that order stated: "The defendant is not being prosecuted for engaging in constitutionally protected speech, but for his allegedly harassing conduct by leaving numerous voice messages directed at the complainant, heard by her at the time set forth in the information, which are alleged to have been harassing, threatening, and demeaning in nature, placing her in fear for her own safety and that of her family." After the issuance of the November 1, 2013 Order, by application dated March 11, 2014, the prosecution withdrew its opposition to Bartel's motion, leading to the dismissal of the criminal charges against him. (*Id*. ¶¶22 -25; Ex. J to Pitcoff Declar.)[3]

## DISCUSSION

I. **Summary Judgment Standard**

Summary judgment, pursuant to Rule 56, is appropriate only where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant governing law in each case determines which

---

[3] On May 13, 2014, the New York Court of Appeals held that N.Y. Penal Law 240.31(1) was unconstitutionally vague and overbroad. *People v. Golb*, 23 N.Y. 3d 455 (2014).

facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When making this determination, a court must view all facts "in the light most favorable" to the non-movant, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "resolve all ambiguities and draw all permissible factual inferences in favor of the [non-movant]," *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). Thus, "[s]ummary judgment is appropriate [only] where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts demonstrating that there is a genuine dispute of material fact to be tried. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-movant must present more than a "scintilla of evidence," *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586-87), and "may not rely on conclusory allegations or unsubstantiated speculation," *Id.* (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary

judgment motions," *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the [non-movant] will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the [non-movant's] case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210-11) (internal quotation marks omitted). Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

II.     **The Parties' Contentions**

As briefly noted above, the complaint contains two causes of action. The first is entitled "malicious prosecution" and is asserted against both Dillner and Guariglia. The second cause of action is asserted solely against Dillner and asserts that she violated Bartel's Second and Fifth Amendment rights by "seeking and obtaining an Order of Protection that required Plaintiff to surrender all of his otherwise legally owned rifles and shotguns during the pendency of the criminal matter . . . [and] without a legitimate basis." (Comp. ¶ 21

Defendants maintain they are entitled to summary judgment on the first cause of action based on qualified immunity. With respect to the second cause of action, they argue that it is barred by the Rooker-Feldman Doctrine, there was no violation of Bartels' Second Amendment rights and Dillner is entitled to qualified immunity. Finally, they argue there can be no 1983 claims against Dillner as she was not acting under color of law.

In response, Bartels argue that his right to be free from prosecution was clearly established at the time of prosecution and his Second Amendment claim is valid. He further asserts that Dillner is a state actor because she acted together with or obtained significant aid from state officials and because her conduct is otherwise chargeable to the state.

### III. Summary Judgment is Granted on the First Cause of Action

#### A. Applicable Law – Federal Malicious Prosecution Claim

"[T]he merits of a claim for malicious prosecution under [Section 1983] are governed by state law." *Dufort v. City of New York*, 874 F.3d 388, 350 (2d Cir. 2017). Under New York, to prevail on a claim for malicious prosecution, a plaintiff must show "the commencement or continuation of a criminal proceeding against [him]; the termination of that proceeding in [his] favor; that there was no probable cause for the proceeding; and that the proceeding was instituted with malice." *Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (internal quotation marks omitted); *accord Posr v. Court Officer Shield #207*, 180 F.3d 417 (2d Cir. 1999).

#### B. The Malicious Prosecution Claim Fails as a Matter of Law

Bartels claims for malicious prosecution fails as a matter of law. As Judge Amon of this Court recently explained:

> In general, "[o]nce a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." *Douglas v. City of N.Y.*, 595 F. Supp. 2d. 333, 342 (S.D.N.Y. 2009) (alterations in original) (quoting *Williams v. City of N.Y.*, No. 02-CV-3693 (CBM), 2003 WL 22434151, at *6 (S.D.N.Y. Oct. 3, 2003) ). [This is because in order] "[t]o initiate a prosecution, a defendant must do more than report the crime or give testimony. He must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Manganiello v. City of N.Y.*, 612 F.3d 149, 163 (2d Cir. 2010) (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) ). The officer also may file charges himself, have frequent visits with the prosecutors,

> send to prosecutors a false confession he allegedly doctored, or "knowingly create[ ] false information that creates the basis for the prosecution," *id.*; *Myers v. Cty. of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011), because such conduct may "work[ ] an unacceptable 'corruption of the truth-seeking function of the trial process,' " *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976) ).

*King v. City of New York*, 2018 WL 4568798, at *4 (E.D.N.Y. Sept. 24, 2018); *accord Myers v. County of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011) ("In view of the fact that it is ultimately the District Attorney's decision as to whether or not to proceed with a case, the prosecutor's decision to go forward with prosecution will generally cut off the liability of the arresting officers for a claim of malicious prosecution. However, an arresting officer may nonetheless be liable pursuant to a malicious prosecution theory if it can be shown that the officer has knowingly created false information that creates the basis for the prosecution.") (internal citations omitted); *cf. Mara v. Rilling*, 921 F.3d 48, 77 n.19 (2d Cir. 2019) ("Insofar as [plaintiff's] malicious prosecution claim appears to challenge the maintenance of an action against him after evidence implicating another person came to light, that decision was the prosecutor's rather than defendants and, thus, cannot be maintained against them) (citing *Wilson v. City of New York*, 480 F. App'x 592, 595 (2d Cir. 2012) (summary order) (holding that "decision to continue prosecution after the new evidence came to light was made by the assistant district attorney and the court, not by" officers, and thus, no reasonable jury could find officers liable)).

Applying the foregoing principles to the case at bar, requires dismissal of the first cause of action as against both Defendants. Plaintiff does not dispute that Guariglia took Dillner's complaint, prepared a police report, forward the complaint and voicemail recordings to the Suffolk County District Attorney's office in order for that office to determine if the voicemail messages were a prosecutable offense and that the District Attorney's office then commenced a

prosecution against Bartels for violating Penal Law § 240.30(1). There is nothing to support the proposition that Guariglia or Dillner created false information and in fact a copy of the voicemail messages was provided to the District Attorney's office. Nor is there anything to support that either Defendant "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." To the extent Plaintiff relies on the deposition testimony of Chief Flynn in support of an argument that Dillner "actively sought the order of protection against Plaintiff" (*see* Pl.'s 56.1 Resp. at p. 1), that reliance is misplaced.

According to Plaintiff, while Dillner testified at her deposition that she did not actively seek an order of protection, her testimony "was controverted by the testimony of retired Police Chief Flynn . . . ." (*Id.,* citing Flynn Dep. at 55-56.) The referenced deposition testimony is as follows:

> Q. Did it ever come to your attention that Mrs. Dillner or any of the Dillners were seeking an order of protection against Jeff Bartels?
> A. Yeah, I heard that. Yes.
> Q. Where did you hear that?
> A. Probably from my police officers or – and also when the ADA was there.
> Q. Can you be more specific. I mean did you first hear it from your police officers, or did you first hear it from Mrs. Dillner?
> A. I think Mrs. Dillner –
> [objection to form]
> A. I think Mrs. Dillner sought it and inquired with the ADA that she wanted it.
> Q. Okay. How do you know that?
> A. Just what I remember.
> Q. Okay. Did Mrs. Dillner talk to you about an order of protection?
> A. She may have. I have no idea at this time.
> Q. But you are aware that she had been seeking one?
> A. Yeah.

(Ex. 1 to Maloney Declar. (Flynn Dep. at 55:4-56:9).) It is evident from the cited testimony that Flynn has no personal knowledge of any participation in the criminal proceeding by Dillner, other than her original complaint to the police, and certainly no personal knowledge that she sought the order of protection. Moreover, the cited testimony is insufficient to establish any

admission by Dillner as to her participation after she filed a complaint with the police. As such it is inadmissible and provides no support for the malicious prosecution claim.[4]

### C. Defendants are Entitled to Qualified Immunity

The Court now turns to Defendants' argument that they are entitled to summary judgment on the basis of qualified immunity.[5]

"Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted). Rights are "clearly established" where "existing law . . . place[s] the constitutionality of the officer's conduct 'beyond debate.' " *Dist. of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ). "In determining whether a right was so clearly established, the Supreme Court has emphasized that the 'dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Barboza v. D'Agata*, 676 F. App'x 9, 12 (2d Cir. 2017) (summary order) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) ). While a plaintiff need not identify "a case directly on point" to demonstrate that an asserted federal right was clearly established at the time a defendant acted, the Supreme Court has instructed time and again that "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct.

---

[4] A 1983 claim for malicious prosecution also requires that the criminal proceeding terminate in the plaintiff's favor. As enunciated by the Second Circuit this requires that the termination affirmatively indicates his innocence. *Lanning v. City of Glen Falls*, 908 F.3d 19, 28-29 (2d Cir. 2018) Specifically, "[p]roceedings are 'terminated in favor of the accused' only when their final disposition is such as to indicate the accused is not guilty." *Id*. at 26 (quoting *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980) ) (emphasis added). It is far from clear on the current record that such was the reason for the dismissal of the charges against Bartels.

[5] For purposes of this discussion, the Court assumes that Dillner was a "state actor," as Plaintiff maintains, a proposition that is problematic at best.

305, 551 (2015) (per curiam) (emphasis added) (citation omitted); *see also, e.g., City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019); *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) ("The rule must be settled law, ... which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." (internal quotation marks and citations omitted) ); *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) (per curiam) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, . . . but in the light of pre-existing law the unlawfulness must be apparent . . . ." (internal quotation marks omitted) ). To that end, the Supreme Court has described qualified immunity as a "demanding" doctrine protecting "all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ); *accord Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (Qualified immunity protects officers when "their decision was reasonable, even if mistaken"; that, in turn, "protect[s] all but the plainly incompetent or those who knowingly violate the law.") (internal quotation marks omitted).

In deciding whether qualified immunity applies, courts conduct a two-step analysis: "First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? Second, if there was a constitutional violation, was the right clearly established at the time of the officer's actions?" *Barboza*, 676 F. App'x. at 12 (2d Cir. 2017); *see Winfield v. Trottier*, 710 F.3d 49 (2d Cir. 2013) (when deciding the issue of qualified immunity, "courts ask whether the facts shown [1] make out a violation of a constitutional right, and [2] whether the right at issue was clearly established at the time of defendant's alleged misconduct.") (internal quotation marks omitted). Courts, however, "may, in [their] own discretion, refrain from determining whether a constitutional right has been violated and instead move directly to the question of

qualified immunity. . . ." *Costello v. City of Burlington*, 632 F.3d 41, 51-52 (2d Cir. 2011) (Pooler, J., concurring).

Bartels maintains that in view of *People v. Mangano*, 100 N.Y.2d 569 (2003) he had a clearly established right to engage in the speech at issue despite Penal Law 240.30(1). In *Mangano*, the New York Court of Appeals held that that provision could not be applied to the defendant's leaving message with a municipal parking bureau that ""rained invective on two village employees, wished them and their families ill health, and complained of their job performance, as well as tickets that she had received," as they were "made in the context of complaining about government actions, on a telephone answering machine set up for the purpose . . . of receiving complaints from the public." *Id*. at 570-71.

In *Barboza v. D'Agata*, 676 F. App'x 9 (Jan 18, 2017), the Second Circuit distinguished *Mangano*, and held that in the case before it, the defendants were entitled to qualified immunity. First it noted that "*Mangano* did not hold § 240.30(1) violative of the First Amendment in all respects. To the contrary, *Mangano* only distinguished—but did not overrule—*People v. Shack*, 86 N.Y.2d 529, 634 N.Y.S.2d 660, 658 N.E.2d 706 (1995), in which the Court of Appeals upheld a conviction for telephone harassment under § 240.30(2), concluding that liability arose from defendant's 'harassing conduct, not from any expression entitled to constitutional protection,' *id*. at 536." 676 F. App'x at 13. The Circuit then proceeded to state:

> This case is not "on all fours" with *Mangano*, as the district court concluded. . . . Barboza did not transmit his offensive communication through a channel "set up for the purpose . . . of receiving complaints from the public." Rather, he wrote his profane message on a government form the principal purpose of which was to transmit payment for a traffic offense to which he had already pleaded guilty. The recipients of his invective were employees charged with the clerical processing of such payments, not with receiving public complaints. This is not to conclude that such communications are not entitled to constitutional protection from § 240.30(1) prosecution. We observe only that neither *Mangano* nor any other case clearly established such a First Amendment right at the time of the events at issue.

> *See generally Vives v. City of New York*, 405 F.3d 115, 117–18 (2d Cir. 2005) (observing that § 240.30(1) had not been held unconstitutional on its face and declining to reach question where defendants were entitled to qualified immunity). It was only later, in 2014, that the New York Court of Appeals would clarify that § 240.30(1) was unconstitutionally vague on its face, violating the speech protections of both the state and federal constitutions. *See People v. Golb*, 23 N.Y.3d 455, 467, 991 N.Y.S.2d 792, 800–01, 15 N.E.3d 805 (2014).

676 F. App'x at 13-14.[6] Based on the foregoing, the Circuit held that the *Barbazo* defendants were entitled to qualified immunity "because a First Amendment right to engage in the charged conduct in the circumstance of this case was *not* yet clearly established so that no reasonable officer could have thought (even if mistakenly) that Barboza could lawfully be arrested for aggravated harassment in violation of N.Y. Penal Law §240.30(1)." *Id*. at 15.

The reasoning in *Barboza* applies with equal force here. The offensive messages directed to Dillner were not left on a device set up for the purpose of receiving complaints from the public and many of Bartel's messages that were directed to Dillner had nothing to do with the operation of the Village but were directed to her as a resident of Fiddlers Green and/or because of action allegedly committed by her husband. Moreover, § 240.30(1) was not declared unconstitutional on its face by the New York Court of Appeals until after the prosecution agreed to dismissal of the charges against Bartels. Accordingly, this Court cannot conclude that no reasonable person could have believed that Bartels could be arrested for violation of Penal Law ¶240.30(1) without violating the First Amendment.

## IV. Summary Judgment is Granted on the Second Cause of Action

The Second Cause of actions asserts violations of Plaintiff's Second and Fifth Amendment rights solely against Dillner.

---

[6] It should also be noted that the *Barboza* Court "[a]ssum[ed] without deciding that state court decisions can clearly establish a constitutional right . . . ." 676 F. App'x at 13.

Turning first to the claim for alleged violation of his Second Amendment rights, Dillner is entitled to summary judgment dismissing for the same reasons that required dismissal of the claim for malicious prosecution. There is an absence of admissible evidence to support any claim that she actively sought the order of protection. Moreover, as the transcript of the hearing held on May 7, 2013 in *People v. Bartels* demonstrates, Judge Henry issued the order of protection with a provision to surrender any and all handguns, pistols, revolvers and shotguns over the objection of defense counsel (*see* Ex. H to Pitcoff Declar. at 4-17) and there is nothing in that record to indicate that Dillner was or even sought to be heard on the matter. The issuance of the judicial order by Judge Henry was an intervening act which bars any liability on Dillner's part for the alleged Second Amendment violation. *See* cases cited at page 12 *supra*.

Two other observations are in order. First, given Plaintiff's concession regarding the unsettled nature of the Second Amendment's right to bear arms (*see* Pl.'s Mem at 4-5*)*, qualified immunity is also applicable to this claim. Second, to the extent that Plaintiff is asserting that he was deprived of property without due process, the claim is rejected. Bartels asserts a violation of the Fifth Amendment and Fifth Amendment due process claims may only be asserted against federal actors. *See, e.g., Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466-67 (S.D.N.Y. 2009). Moreover, Plaintiff was given an opportunity to be heard on whether an order directing the surrender of his various firearms would be issued. *See generally Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001) (Ordinarily, due process "requires that a state or local government afford persons 'some kind of hearing' prior to depriving them of a significant liberty or property interest.") He also had the ability to pursue an appeal of that order under New York law. As such due process was satisfied.

## CONCLUSION

Defendants' motion for summary judgment is granted. The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
      May 10, 2019

      s/ Denis R. Hurley
      Denis R. Hurley
      United States District Judge